**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| NEVLON MORGAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:15-CV-2589-L (BH) |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for determination of non-dispositive motions and issuance of findings, conclusions and recommendation. Before the Court are *Plaintiff's Brief on Appeal*, filed November 20, 2015 (doc. 17), and *Commissioner's Brief*, filed December 15, 2015 (doc. 18).  Based on the relevant filings, evidence, and applicable law,  the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND[1]

### A.    Procedural History

Nevlon Morgan (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and supplemental security income (SSI) under Title XVI of the Act.  (R. at 1, 48-65.)  On April 17, 2012, and April 19, 2012, Plaintiff filed her applications for disability benefits under Title II and Title XVI of the Act, respectively, alleging disability beginning

---

[1]   The background information is summarized from the record of the administrative proceeding, which is designated as "R."

on April 9, 2012. (R. at 48.)  Her claims were denied initially and upon reconsideration. (R. at 1, 65.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on May 7, 2014. (R. at 95-157.) On June 10, 2014, the ALJ issued a decision finding that Plaintiff was not disabled and denying her claims for benefits. (R. at 48-65.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council and included new medical evidence. (R. at 1.) The Appeals Council denied consideration of the new evidence and denied her request for review on July 1, 2015, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-2.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.      Factual History**

**1.      Age, Education, and Work Experience**

Plaintiff was born on June 17, 1966, and was 45 years old at the time of the hearing before the ALJ. (R. at 65.)  She completed the eleventh grade and could read and write in English but had not earned a GED. (R. at 65.) She had past relevant work as a parcel post clerk, a data entry clerk, and a salesperson of general merchandise. (R. at 65-66.)

**2.      Medical Evidence**

Beginning January 24, 2012,  Plaintiff received treatment at Patients Choice Rehab from Dr. Ara Robert Dayian, M.D., for her carpal tunnel syndrome. (R. at 326-77.) Plaintiff received a nerve conduction velocity electromyography that revealed bilateral sensory carpel tunnel syndrome and a potential right ulnar motor neuropathy across the elbow, on March 22, 2012. (R. at 356-59.) She received a magnetic resonance imaging (MRI) test on her right shoulder on April 12, 2012, that revealed a possible partial thickness undersurface supraspinatus tendon tear. (R. at 355.)

2

Dr. Dayian referred Plaintiff to Dr. Terry Madsen, M.D., an orthopedic surgeon with Bush Renner Orthopedics. (R. at 351-61, 783-98.) On May 14, 2012, Dr. Madsen performed an open carpal tunnel release surgery on the right wrist. (R. at 382, 394.) Plaintiff saw Dr. Madsen on May 31, 2012, and complained of right wrist pain, right shoulder pain, tingling in the fingers, swelling, and trembling. (R. at 479.)

From June 19, 2012, through August 8, 2012, Plaintiff received physical therapy with Dr. Dayian at Patients Choice Family Medicine and Rehab (PCFMR). (R. at 516-40, 722-33.)

On June 25, 2012, Dr. John Durfor, M.D., a state agency medical examiner for Disability Determination Services, completed a Physical Residual Functional Capacity form. (R. 507-14.) Dr. Durfor opined that Plaintiff had the ability to perform light work activities with the following limitations: occasionally lift/carry 20 pounds; frequently carry/lift 10 pounds; stand about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push/pull capacity limited in her upper extremities. (R. 508-10, 514.)  On December 28, 2012, state agency medical examiner, Dr. James Wright, M.D., completed a Case Assessment Form and affirmed Dr. Durfor's assessment. (R. at 682-83.)

On October 4, 2012, Plaintiff received a nerve conduction velocity/electromyography, which showed bilateral (right greater than left) sensory carpal tunnel syndrome and bilateral (right greater than left) ulnar sensory neuropathy. (R. at 799-802.) On October 24, 2012, Plaintiff underwent a functional capacity examination at PCFMR that showed that she was functioning at less than the sedentary physical demand work level. (R. at 717-21.) On January 8, 2013, Plaintiff underwent another functional capacity examination at PCFMR that found that she was functioning at a less than sedentary physical demand work level. (R. at 699-706.)

On November 28, 2012, through January 16, 2013, Plaintiff was treated by Dr. R. Robert Ippolito, M.D., at Dallas Medical Center. (R. at 685-98, 811-12, 821-27.) Dr. Ippolito performed a maximum medical improvement examination on January 16, 2013, and found that Plaintiff had right carpal tunnel syndrome-status post failed decompensation and complex regional pain syndrome (CRPS), also known as reflex sympathetic dystrophy (RSD). (R. at 686.) Dr. Ippolito referred Plaintiff to Dr. Nathaniel Kho, M.D., for an examination on January 14, 2013, and Dr. Kho's assessment was RSD of the upper limb. (R. at 808-10.)  Plaintiff continued treatment with Dr. Kho through May 22, 2013. (R. at 887-917.)

On February 25, 2013, Dr. Stuart Small, M.D., performed an impairment rating examination and issued a whole person impairment rating of 33% for RSD, carpal tunnel syndrome, and wrist pain. (R. at 833-38.)

On March 20, 2013, Dr. Arvind Chopra, M.D., completed the internal review of Plaintiff's physical limitations and opined that Plaintiff was limited to sedentary work activities with the additional limitations of occasional handling, fingering, and feeling. (R. at 858.)

On April 11, 2013, Plaintiff began pain management treatment with Dr. Neil Atlin, D.O., of Texas Anesthesia and Pain Management. (R. at 864-7.) Dr. Atlin's diagnoses were: CRPS stage II of the right wrist and hand spreading into the right shoulder due to a work-related injury and failed surgery; possible CRPS spreading into the right lower extremity; carpal tunnel syndrome of the left arm and hand (cannot rule out early CRPS); generalized myofacial pain syndrome; and moderate reactive depression, insomnia and chronic pain state. (R. at 866.) On June 18, 2013, Dr. Atlin performed a right stellate ganglion block. (R. at 860.)

On January 9, 2014, Plaintiff had a consultative neurological examination with Dr. Bobby

Huynh, M.D., whose diagnoses were: RSD; carpal tunnel syndrome; neuralgia/neuritis; skin sensation disturbance; joint pain pelvis; sacroiliac sprain; enthesopathy of the hip; depressive disorder; chronic pain syndrome; and anxiety adjustment disorder. (R. at 874-76.) In a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) form, Dr. Huynh opined that Plaintiff was limited to carrying up to 10 pounds occasionally with the left hand only and she was limited to never reaching, handling, fingering, feeling, pushing, or pulling with the right upper extremity. (R. at 877-79.)

From June 26, 2013, through February 14, 2014, Plaintiff continued to receive pain management treatment with Dr. Atlin. (R. at 928-29, 940-42, 954-64.) On April 4, 2014, Dr. Atlin completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), which stated that Plaintiff was limited to lifting and carrying ten pounds occasionally, and sitting, standing, and walking for 2-hours total in an 8-hour work day. (R. at 1008-10.) He further opined the Plaintiff's ability to reach, handle, feel, push, and pull were affected due to CRPS in all 4 limbs. (R. at 1009.)

### 3.   Hearing Testimony

On May 7, 2014, Plaintiff, a medical expert (ME), and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 95-157.) Plaintiff was represented by an attorney. (R. at 97.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that she did not have a high school diploma or GED and last completed the eleventh grade. (R. at 137.) She received Workman's Compensation in the amount of $284.00 per week in 2012. (R. at 100.) She also received short-term disability payments from Aetna over the same time period. (R. at 102.) Over the past fifteen years, she worked for at least a year in the capacity of general merchandise salesperson and data entry clerk. (R. at 135-36.) She worked as a

5

fork lift operator in a part-time basis through a temporary agency.  (R. at 136.) Plaintiff's most recent work history was as a parcel post clerk with UPS, where she had worked for five years. (R. at 140.)

>    *b.*    ***ME's Testimony***

The ME testified that he had never treated Plaintiff but had reviewed the medical records that were used as exhibits during the hearing. (R. at 103.) He explained that Plaintiff's impairments were carpal tunnel syndrome in the right upper extremity, and that he saw a diagnosis of reflex sympathetic dystrophy in the record, but he failed to see objective evidence of the diagnosis. (R. at 104-7.) He also explained that he did not see any objective evidence that would explain Plaintiff's alleged leg pain and difficulty bending and standing for a prolonged period.  (R. at 108.)

The ALJ asked the ME what the Plaintiff's limitations were in regard to her hands, and the ME said that she not could use her right upper extremity but could "certainly" use her left upper extremity. (R. at 110.) He did clarify that Plaintiff might be able to use her right upper extremity "briefly as a guide" but would not be able to do any fine movement with it, including grasping or fingering. (R. at 110.) He testified that Plaintiff could "lift 20 pounds occasionally and 10 pounds frequently" with her left upper extremity. (R. at 111.) He also explained that she was not limited in walking and standing and that she could reach and grasp overhead with her left but not her right hand. (R. at 111.)

Plaintiff's attorney questioned the ME about whether he had placed Plaintiff at a less restrictive residual functional capacity than any of the other doctors who had actually treated her, and the ME agreed that he had. (R. at 115-116.)

The ALJ then asked the ME about a nerve conduction study that found that there was "no

evidence of a motor carpal tunnel syndrome," but there was evidence of bilateral sensory carpal tunnel syndrome on Plaintiff's right extremity. (R. at 121-23.) The ME explained that this nerve conduction study did not show that Plaintiff had severe carpal tunnel syndrome. (R. at 125.) The ALJ also asked about a shoulder MRI finding that Plaintiff had "possible partial thickness under safe supraspinatus tendon tear." (R. at 125.) The ME explained that the finding was "possible" because "sometimes there's little partial tears that could be painful for a short period of time," but they "usually heal up over a period of a few months." (R. at 126.)

   *c.*  ***VE's Testimony***

   The VE testified that Plaintiff had past relevant work as a parcel post clerk (DOT 222.387-038, heavy, SVP: 3), data entry clerk (DOT 203.582-054, sedentary, SVP: 4), forklift operator (DOT 921.683-050, medium, SVP: 4), and general merchandise salesperson (DOT 279.357-054, light, SVP: 3). (R. at 128-30.)

   The ALJ asked the VE to consider a hypothetical person with an "eleventh grade education, semi-skilled past relevant work who was able to lift and carry 20 pounds occasionally and 10 pounds frequently with the left upper extremity" and "unable to lift any weight with the right upper extremity" but could use it to assist. (R. at 141-42.) This hypothetical person was able to stand and walk for six hours during an eight-hour workday, push and pull frequently with the left upper extremity, grasp and squeeze for two hours, operate foot control constantly, and reach in all directions bilaterally. (R. at 142.) This hypothetical individual was able to perform handling and fingering frequently with the left upper extremity and occasionally with the right upper extremity; climb stairs but never scaffolds, ladders, and ropes; crouch, balance, kneel, stoop, and squat frequently; but could not be exposed to moving machinery or extreme heat or cold. (R. at 142.)

Additionally, this hypothetical person could be exposed to the general public and is able to use judgment appropriately. (R. at 141-43.) The ALJ asked if that hypothetical individual could perform any of Plaintiff's past relevant work, and the VE said no. (R. at 143.)

The ALJ then asked if there were "any jobs in the national economy or occupations in the national economy in sufficient numbers that an individual with the aforementioned limitations would be able to perform." (R. at 144.) The VE replied that she was "not sure what [the ALJ would] consider sufficient numbers," but there were three possible jobs: surveillance system monitor (DOT 379.367-010, sedentary, SVP: 2) with 1,000 jobs in Texas, 17,000 jobs nationally; school bus monitor (DOT 372.667-042, light, SVP: 2) with 975 jobs in Texas and 17,000 jobs nationally; and call-out operator (DOT 237.367-014, sedentary, SVP: 2) with 1,400 jobs in Texas and 16,000 jobs nationally. (R. at 144-45.)

The ALJ added an additional limitation to the hypothetical in that the individual could not (instead of occasionally) handle or finger with the right upper extremity. (R. at 146.) The VE said that the person could still perform the surveillance system monitor and school bus monitor positions, but it would preclude the call-out operator position. (R. at 147-48.)

Plaintiff's attorney asked the VE if a school bus monitor was a full-time job, to which she replied that it was "usually part time" with four hours a day, but there were "some locations that it's more hours . . . and sometimes they elect to take a full 12 months," and she could "do that on two different schools and do it full time . . . depending on the hours." (R. at 148-49.) Based upon these questions, the VE changed her testimony and said that the number of school bus monitor jobs in Texas would be eroded by 20% to account for full-time positions. (R. at 149.) This lowered the number of school bus monitor jobs in Texas from 975 to 780. (R. at 151.) There were no questions

by the ALJ or testimony from the VE regarding full-time school bus monitor positions nationally.

## C.   ALJ's Findings

The ALJ issued her decision denying benefits on June 10, 2014. (R. at 65.) At step one,[2] she determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of April 9, 2012. (R. at 50). At step two, she found the following impairments to be severe: carpal tunnel syndrome, reflex sympathetic dystrophy, chronic pain syndrome, partial thickness undersurface supraspinatus tendon tear of the right shoulder, major depressive disorder, and anxiety disorder. (R. at 50-51.) At step three, the ALJ concluded that Plaintiff's severe impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 52-55.)

Next, the ALJ determined that Plaintiff's subjective complaints were not credible to the extent alleged. (R. at 55-64.) The ALJ determined that Plaintiff retained the RFC to perform less than the full range of light work with the following limitations: she could stand or walk for six hours throughout an eight-hour workday; sit for six hours throughout the workday; lift and carry twenty pounds occasionally and ten pounds frequently with the left upper extremity; not lift any weight with the right upper extremity; push and pull frequently with the left upper extremity, but only assist with the right upper extremity; constantly reach overhead with the left upper extremity; frequently reach overhead with the right upper extremity; reach with no limitation in all other directions bilaterally; frequently handle and finger with the left upper extremity; not perform any grasping, fingering, feeling, or other manipulation with the right upper extremity; not crawl or climb ladders, ropes, or scaffolds; constantly operate foot controls; frequently climb stairs, crouch, balance, kneel, stoop, or

---

[2]  A five-step analysis is used to determine whether a claimant is disabled under the Social Security Act and is described more specifically below.

squat; not tolerate exposure to extreme heat or cold, moving machinery, commercial driving, or concentrated vibration; perform only simple, routine, repetitive tasks; respond appropriately to supervisors and coworkers; be exposed to the general public; use judgment appropriately; tolerate routine work changes; and maintain attention, concentration, persistence, and pace for two hours at a time for a total of eight hours throughout the workday. (R. at 55.)

At step four, the ALJ determined that Plaintiff could not return to any of her past relevant work. (R. at 64.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that exists in significant numbers in the national economy. (R. at 64-65.) The ALJ found that Plaintiff could perform jobs such as surveillance system monitor and school bus monitor. (R. at 65.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from April 9, 2012, through the date of her decision. (R. at 65.)

**D.      New Evidence Submitted to the Appeals Council**

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence that consisted of 30 pages from Dr. Driggs of the Texas Department of Insurance from May 24, 2014; 13 pages from Ms. Parker from December 19, 2014; and 26 pages from Texas Anesthesia and Pain Management from June 12, 2014, to May 7, 2015. (R. at 8-44.) The Appeals Council denied her request for review on July 1, 2015, and determined that the new evidence is "information about a later time" and should not be considered. (R. at 1-2.)

## II. ANALYSIS

**A.      Legal Standards**

**1.      Standard of Review**

Judicial review of the commissioner's denial of benefits is limited to whether the

10

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mentla

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greendspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.

*Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**     **Issues for Review**

Plaintiff presents two issues for review:

(1) The Administrative Law Judge failed to properly weigh all of the medical opinions.

(2) There were not a significant number of jobs that Plaintiff could still perform with the found RFC.

**C.**     **Medical Opinion Evidence**

Plaintiff argues that the ALJ erred by failing to properly evaluate all of the medical opinions in the record when determining her RFC. (Doc. 17 at 13-17.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir.1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no

13

information in the record indicates that such a limitation or restriction exists. *See* SSR 96–8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir.1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff points to four medical opinions that the ALJ allegedly failed to properly consider: (1) Dr. Bobby Huynh's Medical Source Statement of Ability to do Work-Related Activities (Physical) form from January 12, 2014; (2) Dr. Neil Atlin's medical opinion from April 4, 2014, that Plaintiff was limited to standing and walking for a total of 2 hours in an 8 hour workday; (3) Plaintiff's functional capacity examination at Patients Choice on October 24, 2012; and (4) her functional capacity examination at Patients Choice on January 8, 2013. (Doc. 17 at 14-18.)

### 1.   *Dr. Bobby Huynh – Limitations on Carrying/Holding*

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical

opinion is evaluated regardless of its source. 20 C.F.R. § 404.1527(c)(1) (2012).  Generally, an

opinion from an examining source is given more weight than the opinion from a non-examining

source.  *Id.*  However, the "standard of deference to the examining physician is contingent upon the

physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining

physician is not the claimant's treating physician and where the physician examined the claimant

only once, the level of deference afforded his opinion may fall correspondingly."  *Rodriguez v.*

*Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th

Cir. 1990)).  The ALJ is also free to reject the medical opinion of any physician when the evidence

supports a contrary conclusion.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).  Moreover,

"[w]hen a treating or examining physician's opinions are inconsistent with other substantial

evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision."

*Smith v. Comm'r of Soc. Security Admin*, No. 4:12-CV-00625-DDB, 2014 WL 4467880 at*3 (E.D.

Tex. Sept. 9, 2014); *Morvant v. Comm'r of Soc. Security Admin.*, No. 12-CV-2716, 2014 WL

868912, at *9 (W.D. La. Feb. 28, 2014) (same).

The ALJ had Plaintiff undergo a consultative neurological examination with Dr. Bobby

Huynh on January 9, 2014. (R. at 874-6.) Dr. Huynh opined on a Medical Source Statement of

Ability to do Work-Related Activities (Physical) form dated January 12, 2014, that Plaintiff was

limited to: lifting 11 to 20 pounds occasionally; carrying up to 10 pounds occasionally with the left

hand only; and never reaching overhead, reaching in all other directions, handling, fingering, feeling,

pushing and pulling with the right upper extremity. (R. at 877-79.)

The ALJ, in her decision, explained that she "generally gives great weight to [Dr. Huynh's]

assessment of the claimant's lifting, carrying, pushing, pulling, and manipulative abilities," but still determined that Plaintiff retained the ability to lift and carry 20 pounds occasionally with her left upper extremity. (R at 55, 62.) By not incorporating the 10 pound carrying limitation in her decision, the ALJ implicitly rejected Dr. Huynh's opinion. When Plaintiff's medical records are reviewed as a whole, substantial evidence exists that shows Plaintiff could lift 20 pounds occasionally with her left hand. The medical records show that Plaintiff demonstrated grip strength of 40 pounds during most examinations, and that Dr. Durfur, Dr. Wright, and Dr. Goldstein all opined that Plaintiff could carry up to 20 pounds with her left arm. (R. at 60-63.)  Dr. Kho furthermore noted "4/5" or "5/5" strength in the left upper extremity at every examination he conducted. (R. at 59, 888, 892, 895, 899). The ALJ's decision to weigh Dr. Durfur's, Dr. Wright's, and Dr. Goldstein's medical opinions more heavily does not amount to a reversible error. *See Rodriguez*, 35 F.3d at *2. Further, because Dr. Huynh's diagnosis conflicted with the other medical evidence, his opinion was not entitled to any specific weight in the ALJ's decision.  *Smith*, 2014 WL 4467880 at*3; *Morvant*, 2014 WL 868912, at *9.

To the extent that Plaintiff complains of the failure to include medical evidence from Dr. Huynh on Plaintiff's limitations on carrying/holding in the determined RFC, the ALJ did not err and remand is not required.

### 2.      *Dr. Neil Atlin & Dr. Bobby Huynh – Limitations on Standing/Walking*

Plaintiff next argues that the ALJ erred by failing to include Dr. Atlin's and Dr. Huynh's medical opinions regarding the limitations on Plaintiff's ability to stand during the workday into the determined RFC and to account for potential deterioration of Plaintiff's function over time. (Doc. 17 at 17-18.)

Dr. Atlin completed a Medical Assessment of Ability to do Work-Related Activities (Physical) on April 4, 2014, in which he opined that Plaintiff was limited to standing and walking for 2-hours total in an 8-hour work day. (R. at 1008-10.) He further opined the Plaintiff's ability to reach, handle, feel, push and pull were affected due to CRPS in all 4 limbs. (R. at 1009.) Dr. Huynh similarly opined on a Medical Source Statement of Ability to do Work-Related Activities (Physical) form dated January 12, 2014, that Plaintiff was limited to standing/walking for a total of 2 hours in an 8-hour workday. (R. at 877-79.)

The ALJ, in her decision, found that Plaintiff could stand/walk for 6 hours in an 8-hour workday. (R. at 55.) She noted in her decision that she gave little weight to Dr. Huynh's standing and walking limitations because they were inconsistent with his own consultative examination report, and also gave little weight to Dr. Atlin's opinions because the evidence did not surface until early 2014, and the origin of the impairment was difficult to establish. (R. 62.) When Plaintiff's medical records are reviewed as a whole, substantial evidence exists to overcome Dr. Atlin's and Dr. Huynh's medical opinions regarding Plaintiff's standing/walking limitations. The medical records show that Dr. Durfur, who examined the Plaintiff in person, opined that she could stand or walk for at least 6 hours during the 8-hour workday. (R. at 507-14.) Dr. Wright and Dr. Goldstein affirmed these opinions regarding Plaintiff's standing/walking limitations. (R. at 682.) The medical records also show that Dr. Huynh found normal range of motion in both lower extremities and "5/5" strength, even though Plaintiff walked with an antalgic gait. (R. at 875.) The ALJ may accord little weight to Dr. Huynh's opinions because his own records contradict his opinions on Plaintiff's limitations. *Greenspan*, 38 F.3d at 237. The ALJ has the responsibility to resolve these conflicting medical opinions and properly determined with substantial evidence that Plaintiff could stand or

walk for 6 hours during the 8-hour workday. (R. at 57); *see also Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (*citing Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

To the extent that Plaintiff complains of the failure to include medical evidence from Dr. Huynh or Dr. Atlin regarding Plaintiff's limitation on standing/walking in the determined RFC, the ALJ did not err and remand is not required.

### 3.       *Functional Capacity Examinations*

Plaintiff argues that the ALJ erred by failing to consider or assign weight to Plaintiff's functional capacity examinations. (Doc. 17 at 18.)

Plaintiff had two functional capacity examinations at Patients Choice Rehab on October 24, 2012, and on January 8, 2013. (R. at 699-706, 717-18.) An exercise physiologist evaluated them and opined that Plaintiff was functioning at a less than sedentary level and that she was able to dynamically lift 0 pounds. (R. at 701, 720.) The ALJ, in her decision, did not adopt these limitations and did not mention or assign them any weight.

The functional capacity examinations are not "medical opinions" because they are statements from exercise physiologists and not "statements from physicians and psychologists or other acceptable medical sources." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An exercise physiologist is not an acceptable medical source, and his assessments constitute lay opinions. 20 C.F.R. §§ 404.1513, 416.913. Here, the ALJ instead noted three opinions from licensed physicians, Dr. Durfur, Dr. Wright, and Dr. Goldstein, indicating that Plaintiff could perform light work. (R. 61-64.) There was substantial evidence for the ALJ to determine that Plaintiff did not function at less than sedentary levels.

To the extent that Plaintiff complains of the failure to include her functional capacity examinations, the ALJ did not err and remand is not required.

## D.   <u>Significant Number of Jobs</u>

In her second issue, Plaintiff argues that the ALJ erred in finding that there was a significant number of jobs that she could perform. (Doc. 17 at 18.)

At step 5 of the sequential review process, it is the Commissioner's burden to show that a claimant is capable of performing other gainful employment in the national economy. *Greenspan*, 38 F.3d at 236; 20 C.F.R. § 404.1520(a)(4)(i). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). Jobs that are isolated and exist in only very limited numbers in relatively few locations outside of the region where a claimant lived would not qualify under this test. *Id*. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)).

### *1.    Number of Jobs Plaintiff Could Perform*

To establish that work exists for a claimant in significant numbers, the ALJ relies on the testimony of a VE in response to hypothetical questions[3] or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the

---

[3]   "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).

Grids." *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). The Fifth Circuit has not, in a published opinion, laid out an express number or test to determine a "significant number" of jobs. *See Lirley v. Barnhart*, 124 F. App'x. 283, 284 (5th Cir. 2005) (holding that 50,000 jobs in the national economy was a significant number). Courts in the Fifth Circuit have utilized the test delineated by the Sixth Circuit, that a "judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the [VE]'s testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (finding 1,350–1,800 jobs in a nine-county area in Ohio to be significant); *see also Johnson v. Colvin*, No. 3:15-CV-1737-N, 2016 WL 1212436, at *4 (N.D. Tex. Feb. 25, 2016), report and recommendation adopted, No. 3:15-CV-01737-N, 2016 WL 1228630 (N.D. Tex. Mar. 28, 2016) (finding that 1,000 jobs in Texas and 9,200 nationally does not constitute a significant number of positions); *Doddy v. Comm'r, Soc. Sec. Admin.*, No. 12–CV–384, 2014 WL 1268567, at *7 (E.D. Tex. 2014) (finding that 3,400 jobs in Texas and 61,000 jobs in the national economy represented a significant number); *Thompson v. Astrue*, No. 08–CV–1134–G, 2010 WL 2816677, at *7 (N.D. Tex. 2010) (finding that 105,000 jobs in the national economy was sufficient); *Mericle v. Sec'y of Health and Human Serv.*, 892 F. Supp. 843, 847 (E.D. Tex 1995) (finding that 870 jobs in Texas was not a significant number.)

Here, the ALJ relied solely upon the testimony of the VE to determine that there were a significant number of jobs that Plaintiff could perform. (R. at 66.) When posed a hypothetical by the

ALJ based upon Plaintiff's circumstances, the VE testified that there were two jobs that she could perform but that she was "not sure what [the ALJ would] consider sufficient numbers." (R. at 51.) The ALJ failed to explain or follow-up with the VE on what a significant or sufficient number of jobs might be under these facts. The VE testified that Plaintiff was able to perform the job of surveillance system monitor (DOT 379.367-010, sedentary, SVP: 2) that had 1,000 jobs in Texas and 17,000 nationally and the job of school bus monitor (DOT 372.667-042, light, SVP: 2) that had 975 jobs in Texas and 17,000 nationally. (R. at 144-47.) The ALJ confirmed with the VE that the school bus monitor job did not require lifting but did not ask if these jobs existed in significant numbers or if they were found only in very limited numbers in relatively few locations outside of where Plaintiff lived. On cross-examination, the VE changed her testimony when asked by Plaintiff's lawyer if all school bus monitor jobs were full-time positions. (R. at 148-49.) The VE testified that school bus monitors were "usually part time" and that it was a "possible" full-time job if she "might do that on two different schools." (R at. 148-49.) The VE then explained that the number of school bus monitor jobs in Texas should be "eroded" by 20% to account for fewer full-time positions, meaning that her testimony was now that there were 780 school bus monitor jobs in Texas. (R. at. 149.) The VE did not explain how she arrived at the 20% figure or if that would also apply to the national number of full-time jobs. The ALJ failed to ask what the national number of jobs would be for full-time school bus monitors and failed to include this figure in her decision.

The ALJ ultimately found that 1,000 jobs in Texas and 17,000 nationally for a surveillance system monitor and 780 jobs in Texas for a school bus monitor[4] were a significant number of jobs

---

[4] The ALJ also included the 17,000 national jobs for school bus monitors in her decision, but she failed to reduce this number to account for fewer full-time school bus monitor positions to be consistent with the reduction in the number of full-time school bus monitor positions in Texas. (R. at 66.) There is nothing in the record reflecting any consideration or calculation for this reduction.

for Plaintiff's RFC. There is a lack of substantial evidence to support the Commissioner's decision because the VE's testimony on the number of school bus monitor jobs is insufficient and the number of surveillance system monitor jobs has been found by others courts in the Fifth Circuit as insufficient evidence of a significant number of jobs in the national economy. *See, e.g., Walker*, No. H-93-2507, 1994 WL 171209, at *2 (S.D. Tex. Jan. 6, 1994) (holding that 1,800 surveillance system monitor jobs in Texas and 18,000 nationally was not significant); *see also Johnson v. Colvin*, No. 3:15-CV-1737-N, 2016 WL 1212436, at *4 (N.D. Tex. Feb. 25, 2016), report and recommendation adopted, No. 3:15-CV-01737-N, 2016 WL 1228630 (N.D. Tex. Mar. 28, 2016) (holding that 1,000 surveillance system monitor jobs in Texas and 9,200 nationally does not constitute a significant number of positions either within the state of Texas or in the national economy). Accordingly, there is a lack of substantial evidence to support the ALJ's step 5 finding that Plaintiff could perform other work existing in significant numbers. *Greenspan*, 38 F.3d at 236.

### 2.      *Harmless Error*

As noted, an ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. Here, the ALJ found that there were a significant number of school bus monitor positions in Texas and surveillance system monitor positions nationally and in Texas for Plaintiff's RFC. (R. at 66.) As discussed, there was a lack of substantial evidence for this determination, and it ultimately resulted in the finding that Plaintiff was not disabled and should not receive disability benefits. The ALJ's decision that Plaintiff could perform other jobs existing in significant numbers in the national economy therefore affected Plaintiff's substantial rights. The error is not harmless, and remand is warranted.

## III. RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

**SO RECOMMENDED** on this 6th day of September, 20016.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE